**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**
**CRIMINAL ACTION NO. 4:25-CR-00027-GNS-HBB**

**UNITED STATES OF AMERICA**                                           **PLAINTIFF**


**VS.**


**JAMES B. SCOTT**                                                     **DEFENDANT**


### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION

Defendant James B. Scott is charged with a single count of Conspiracy to Possess with the

Intent to Distribute a Controlled Substance.[1]  The charge arises from a traffic stop during which

police discovered narcotics.  Scott filed a motion to suppress incriminating statements he made

during a later custodial interrogation,[2] the United States filed a Response in opposition[3] and the

motion was referred to the undersigned for recommended disposition.[4]  On April 22, 2026, the

undersigned conducted an evidentiary hearing at which Scott and Hopkins County Sheriff's Office

Deputy Brad Ross testified.[5]  Scott filed a post-hearing brief,[6] as did the United States.[7]

Scott contends that his statements should be suppressed because he was not advised of his

*Miranda* rights prior to questioning.  He frames the issue:

> Mr. Scott was a passenger in a vehicle stopped by police for a traffic violation
> shortly after midnight on November 12, 2024.  After the officers noted what they
> believed to be the odor of marijuana, the occupants of the car were told to exit, and

---

[1] DN 1.
[2] DN 28.
[3] DN 31.
[4] DN 29.
[5] The transcript of the hearing is filed at DN 36.
[6] DN 38.
[7] DN 39.

the car was searched. Suspected methamphetamine was found next to the driver's seat, and in the trunk of the car. After this discovery, while still at the scene of the traffic stop, Deputy Reynolds handcuffed and interrogated the occupants of the car, including Mr. Scott. At that time, Deputy Reynold read Mr. Scott the *Miranda* warnings. While Mr. Scott did not explicitly waive his Miranda rights, he answered questions posed by Reynolds, denying any knowledge of the methamphetamine.

Mr. Scott was then taken to the Hopkins County Jail where he was housed in the detox unit. At some point during the day, Detective Brad Ross of the Vice-narcotics Unit (who had not been at the scene of the stop) went to the jail to interview Mr. Scott and the other occupants of the car. He interrogated Mr. Scott while he was in custody at the jail, and without an attorney present. During this interrogation, Mr. Scott made several incriminating statements. Mr. Scott alleges he was not advised of his right per *Miranda* at this time, and under the circumstances, he did not make a knowing, intelligent and wholly voluntary relinquishment of his rights under the Fifth and Sixth Amendments.[8]

While the parties agree that Scott was advised of his *Miranda* rights after he was taken into custody at the traffic stop, they disagree about whether he was again advised of his rights prior to questioning by Detective Ross at the Hopkins County Jail. Detective Ross testified that he read the rights from a card immediately before questioning, and Scott waived his right to remain silent and spoke with him. Scott testified that Detective Ross did not advise him of his rights before questioning him.

> The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In the seminal decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court established procedural safeguards to protect the core of the right against self-incrimination. These safeguards require law enforcement officers to inform suspects of their rights—colloquially known as Miranda warnings—before questioning. These warnings advise individuals that: (1) they have a right to remain silent, (2) anything they say can and will be used against them in a court of law, (3) they have the right to consult with a lawyer before interrogation and to have the lawyer present during interrogation, and (4) if they cannot afford an attorney, one will be appointed for them before questioning begins. *Id.* at 467-73.

---

[8] DN 28, p. 2.

*United States v. Guerrero*, 168 F.4th 454, 460 (6th Cir. 2026).  Unless a suspect knowingly, voluntarily, and intelligently waives these rights, any statements made will be excluded as a result of an involuntary waiver.  *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000).

The case at hand calls upon the Court to make a credibility determination between the testimonies of Scott and Detective Ross as to whether he read the rights advisement.  The case presents the additional legal question of whether it matters if Scott was advised of his rights before questioning at the jail, given that he had been advised of his rights earlier during the traffic stop and had voluntarily spoken with police.

1.  Detective Ross' Testimony

Detective Ross has been a law enforcement officer for fifteen years.  The first five with the Dawson Springs Police Department, followed by ten years with the Hopkins County Sheriff's Department.  He has been a detective for the last five of those years.[9]

Detective Ross testified a Hopkins County Deputy Sheriff advised him that he had conducted a traffic stop, seized a large quantity of narcotics, and arrested three suspects who were lodged at the Hopkins County Jail.[10]  The deputy also told Detective Ross that the suspects had been advised of their *Miranda* rights at the time of arrest.[11]  Detective Ross went to the jail and interviewed all three suspects, Scott, Katherine Browning, and Dane Branscum, separately.  He testified that he conducts the majority of interviews at the police department, where he uses a specialized room equipped with audio recording equipment.  However, the jail has no such dedicated space, so the interviews were conducted in the jail's training room, a general purpose

---

[9] DN 36, Evidentiary Hearing transcript at pp. 4-5 (hereinafter "Tr.").
[10] Tr. pp. 14-15.
[11] Tr. pp. 15, 17.

room.[12]  When he conducts interviews at the jail, he records them with his cell phone.[13]  He also testified that typically several law enforcement officers are present during an interview, but this time he was alone.[14]  Detective Scott testified that he carries a card printed with a standard *Miranda* advisement from which he always reads before beginning any questioning.[15]  He testified that he read the advisement to all three suspects before questioning.[16]  At that time the Sheriff's Department did not utilize any written form whereby the individual being questioned acknowledged having been provided the advisement and waiving the right to remain silent.[17]

Detective Ross first interviewed Browning.  This interview was not recorded because Detective Ross forgot to activate the recording function on his phone.[18]  He explained "I honestly had just forgot to start it. With all three defendants, me being there by myself, that's not typically what we do. We typically have two to four detectives at one time that's doing the interview."[19]

Detective Ross also forgot to start recording his interview of Branscum until questioning was underway.  He explained '[w]hen Ms. Browning left, I had everything set up to start recording, and I was waiting for Mr. Branscum to come in. In between defendants, I tell them to wait so they won't be seen by other inmates. And when he came in and sat down, I just -- again, it's not something I typically do, so it took me a second to hit the record button."[20]

Scott was the last to be interviewed and, again, Detective Ross forgot to activate the recording until after questioning began.[21]  As a consequence, the beginning of the interview at

---

[12] Tr. pp. 7-10.
[13] Tr. p. 11.
[14] Tr. p. 12.
[15] Tr. p. 21.
[16] Tr. pp. 18, 22.
[17] Tr. pp. 32-33.
[18] Tr. p. 18.
[19] *Id.*
[20] Tr. pp. 40-41.
[21] Tr. pp. 42-43.

which time Detective Ross testified he provided Scott the *Miranda* advisement is not part of the recording. Detective Ross testified that he read the advisement, and Scott waived his right to remain silent and agreed to speak with him.[22] The United States points out that the NIBRS Report which Detective Ross completed reflects that he read Scott his *Miranda* rights and he agreed to speak with him.[23] Detective Ross prepared the report the day after the interview.[24]

### 2. Scott's Testimony

Scott testified that on the afternoon after his early morning arrest he was taken to the training room and Detective Ross told him he was there to ask questions about his arrest.[25] He stated Detective Ross did not read the *Miranda* rights from a card nor did he advise him of his right to remain silent.[26] He further testified that he did not know what he was doing because he was "detoxing at the time."[27] On cross-examination, Scott agreed that he had received a *Miranda* advisement at the time of the traffic stop and arrest, and had previously been provided *Miranda* advisements in approximately ten prior encounters with law enforcement during his adult life and understood his right not to speak.[28]

### 3. Whether Detective Ross Provided a *Miranda* Advisement

The only testimony regarding whether Detective Ross provided Scott with an advisement of his *Miranda* rights before questioning is that of Detective Ross and Scott. The NIBRS Report which Detective Ross prepared the following day reflects that he provided a *Miranda* advisement, but that representation is uncorroborated by any other witness. The diametrically opposed

---

[22] Tr. p. 29.
[23] DN 39, p. 2 (referencing United States Exhibit 1: NIBRS Report at p. 6).
[24] Tr. p. 27.
[25] Tr. pp. 49-50.
[26] Tr. p. 50.
[27] Tr. pp. 50-51.
[28] Tr. pp. 61-62.

testimonies cannot be reconciled and the question thus turns entirely on an assessment of credibility.

Scott points to the unusual nature of Detective Ross' conduct in recording the interviews, questioning why an experienced detective would entirely forget to record the first interview and then in each of the two following interviews forget to start the recording at the beginning, thus capturing none of the alleged *Miranda* advisements. Scott asserts that, as the burden rests with the United States, a law enforcement officer's bare testimony is insufficient to carry that burden. He cites *United States v. Jones*, 147 F. Supp. 2d 752, 761 (E.D. Mich. 2001) for the proposition that "the contention that an officer reminded the defendant of his rights prior to a second interview was insufficient without evidence supporting that assertion."[29] More accurately, however, the court held:

> The Government avers that Sgt. Payer reminded Defendant of his *Miranda* rights and warnings immediately before Agent Kendall questioned Defendant. There is no evidence, however, supporting that assertion. Given the lack of evidence for this argument, and considering that it does not comport with Agent Kendall's testimony, the Court rejects it.

*Id.* (citation modified). That Court did not reject the testimony solely because there was no other supporting evidence. The Court also weighed inconsistencies in testimony in making a credibility determination. Here, the United States notes Detective Ross' explanation that he typically conducted interviews in a dedicated room at the police department with built-in recording capability, whereas he was conducting these interviews at the jail where he normally was accompanied by other law enforcement officers sharing the responsibilities.

Looking to Scott's credibility, the United States points out that Scott initially denied any knowledge of the narcotics when questioned during the traffic stop. During Detective Ross'

---

[29] DN 38, p. 7.

questioning, however, Scott provided different information, this time inculpating himself.  This, the United States argues, demonstrates his unreliability.  Moreover, the United States notes that Scott has incentive to lie about the *Miranda* issue so as to have his incriminating statement suppressed and improve his defense position.

The Eastern District of Kentucky was confronted with a similar dispute over the provision of a *Miranda* advisement in *United States v. Solomon*, No. 13-40-ART-(5), 2015 U.S. Dist. LEXIS 124206 (E.D. Ky. Sep. 17, 2015).  In that case, Magistrate Judge Ingram weighed the credibility of the defendant and law enforcement officer, and concluded that the officer's testimony was to be believed.  The District Judge made the following observations in overruling the defendant's objection to the Magistrate Judge's conclusions:

> Solomon argues that Judge Ingram should not have found that "[her] credibility was diminished because she had a personal bias in seeking suppression while . . . Dalrymple did not have any personal bias."  R. 442 at 9.  But "consideration of what a witness has to gain or lose from her testimony is an accepted part of the credibility determination."  *United States v. Lockhart*, No. CRIM. 12-08-ART-(2), 2013 U.S. Dist. LEXIS 48824, at *13, 2013 WL 1412338, at *4 (E.D. Ky. Apr. 4, 2013) (citing Sixth Circuit Pattern Jury Instructions 1.07 (directing jurors to consider whether the witness had "anything to gain or lose from the case")).  Judge Ingram appropriately weighed what the witnesses had to "gain or lose" from their testimony.  He concluded that Solomon had an incentive to lie because she wanted her statements suppressed.  R. 429 at 5.  He concluded that Dalrymple had incentive to tell the truth because there would be negative consequences to his career in law enforcement if he were untruthful.  *Id.*  Solomon might be correct that Dalrymple had some bias at the suppression hearing.  After all, Dalrymple did invest significant time and energy in the investigation.  Yet Dalrymple's potential bias is slight—at worst, the statements he obtained from Solomon would be suppressed.  In contrast, Solomon's potential bias is great—her very freedom is at stake in the case.  Although these biases alone might not be sufficient evidence on which to base a credibility determination, these biases were just one of the many factors Judge Ingram considered in his analysis.  *See* R. 429 at 4-5.  Judge Ingram correctly took these biases into account.

*Id.* at *8-9.

Here, Detective Ross made mistakes in recording all three of the interviews, which does seem unusual for an experienced investigator. He testified at the hearing, however, that he typically uses a police department facility with formal recording equipment rather than recording on his phone. Moreover, when he conducts interviews in the training room at the jail he usually has several other officers participating and assisting. The fact that he forgot to record any of the first interview with Browning actually lends support to his credibility. If his motive was not to provide a *Miranda* advisement and then wait until the interview was underway before beginning the recording to hide the omission, what benefit would have been derived from not recording Browning's interview at all? Had she made an incriminating statement, there would have been no record of it. As in *Solomon*, Detective Ross has relatively little incentive to lie (or make a false statement on the NIBRS Report completed the day after the interview). If he failed to apprise Scott of his *Miranda* rights, the possible consequence would be suppression of the statement. Perjury on his part, however, would be disastrous to his professional career and possibly expose him to a criminal charge. Detective Ross' demeanor and testimony during the evidentiary hearing was credible, and he readily admitted the mistakes he made.

Scott, on the other hand, has significant incentive to lie. If convicted, he faces a penalty of no less than ten years in prison, up to a maximum of life. His self-incriminating statement to Detective Ross would appear a major component of the United States' evidence tying him to the narcotics discovered in the vehicle, and suppression of that statement would greatly inure to his benefit in defending against the conspiracy allegation. For Scott, a perjury charge would matter little in the overall picture given the penalty he already faces. In sum, the undersigned finds Detective Ross the credible witness.

8

It bears noting that when Scott was lodged at the Hopkins County Jail, he was placed in a "detox" cell. Scott testified that, because he was "detoxing" he did not understand what was happening during questioning:

> Q. Do you feel like you gave a knowing and voluntary waiver of your rights?
>
> A. No, sir.
>
> Q. Did you know what you were doing?
>
> A. No, sir.
>
> Q. Why not?
>
> A. I was detoxing at the time.[30]

For a waiver of the right to remain silent to be valid, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Additionally, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Finally, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The determination includes consideration of the suspect's age, experience, education, background, and intelligence and whether the suspect has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waving them. *Fare*, 442 U.S. at 725.

Other than his bare statement that he did not understand what was happening during the questioning because he was "detoxing," Scott offers no other evidence supporting a lack of ability

---

[30] Tr. pp. 50-51.

to comprehend.  His arrest occurred a little after midnight.[31]  Detective Ross interviewed him the following afternoon.[32]  Scott estimates that between 10½ to 16½ hours elapsed between the arrest and jail interview, and Scott thus had a significant amount of time to "detox" from the influence of whatever unidentified substance was involved.  Scott has not developed this argument in his post-hearing brief, nor has he identified anything in the recorded statement of his interview which would suggest he was intoxicated or otherwise impaired.

    4.   Whether a *Miranda* Advisement was Required Before Questioning at the Jail

There is no dispute that when Scott was arrested, he was provided with a *Miranda* advisement and was willing to speak with the officer.  Was Detective Ross required to renew the advisement before questioning him at the jail?

> [A] break in an interrogation does not necessarily require police to re-*Mirandize* a suspect.  *Wyrick v. Fields*, 459 U.S. 42, 43-49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).  "[A]dditional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation." *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010) (citing *Fields*, 459 U.S. at 47, 103 S.Ct. 394).  In making this determination, "[t]he courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (quoting *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995)).  Instead, the court applies a totality of the circumstances test when determining whether a delay between a *Miranda* warning and a subsequent interrogation necessitated that a defendant be re-advised of her rights by the interrogating officers. *United States v. Morris*, 2013 U.S. Dist. LEXIS 104510, 2013 WL 3867836, *3 (S.D. Ohio July 25, 2013) (citing *Treesh*, 612 F.3d at 431).  Under this test, courts ask two important questions:
>
> > (1) whether the defendant knew and understood his rights at the time the *Miranda* warning was given by interrogators and (2) whether anything happened in the time between when the defendant received the warning and the challenged statements that 'rendered Defendant unable to fully consider the effect of an exercise or waiver of those rights before speaking with police.'
>
> *Id*. (quoting *United States v. Jones*, 147 F.Supp.2d 752, 761 (E.D. Mich. 2001)).

---

[31] Tr. p. 30.
[32] Tr. p. 31.

10

*United States v. Sharp*, No. 4:12-CR-28-JHM, 2013 U.S. Dist. LEXIS 174515, at *9-10 (W.D. Ky. Dec. 10, 2013). Both parties have cited cases addressing what constitutes seriously changed circumstances between the initial advisement and subsequent questioning such that re-advisement of *Miranda* rights is required, with conclusions that vary widely. This is unsurprising "[b]ecause of the infinite variety of circumstances a case and a suspect may present, a court determining the admissibility of a statement given in such a situation necessarily accords differing weight to a number of potential factors, and a determinative factor may be non-existent in another case." *United States v. Vasquez*, 889 F. Supp. 171, 177 (M.D. Penn. 1995).

Looking to the first factor, whether Scott knew and understood his rights at the time the *Miranda* warning was given by interrogators, Scott does not contest that he understood his rights when he was initially advised at the time of his arrest and voluntarily spoke with police. Moreover, he testified that he had been the recipient of *Miranda* advisements approximately ten times prior during his adult life, and understood those rights. A defendant's familiarity with the criminal justice system is a factor the Court may consider in evaluating the necessity of a re-advisement after a break in questioning. *See United States v. Morris*, No. 2:13-CR-00086(1)GLF, 2013 U.S. Dist. LEXIS 104510, at *11 (S.D. Ohio July 25, 2013). This factor weighs against the necessity of re-advisement.

As to the second factor, whether anything happened in the time between when Scott received the warning and the challenged statements, Scott estimates that the questioning took place between 10½ to 16½ hours after first being advised of his rights, a substantial break in the questioning. Further, the questioning was conducted at a significantly different type of location and by a different law enforcement agent. Length of time between questioning, change in location, and change in questioner are key factors courts consider in evaluating the totality of the

circumstances.  Here, the undersigned finds them in combination to be sufficient to necessitate that Scott be re-advised of his rights before questioning at the jail.  For this reason, if the District Judge is not inclined to agree with the undersigned's finding that Scott was provided with a re-advisement of his rights at the jail, then the undersigned would recommend suppression of the statement.

**RECOMMENDATION**

WHEREFORE, the undersigned **RECOMMENDS** that the Defendant's motion to suppress, DN 28, be **DENIED**.

H. Brent Brennenstuhl
**United States Magistrate Judge**
June 29, 2026

**NOTICE**

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and FED. R. CIV. P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.  Within **fourteen (14) days** after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.  If a party has objections, such objections must be timely filed, or further appeal is waived.  *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985).

H. Brent Brennenstuhl
**United States Magistrate Judge**
June 29, 2026

Copies:  Counsel

12
